*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A15-0235**

State of Minnesota,
Respondent,

vs.

Ryan James Sabot,
Appellant.

**Filed January 19, 2016
Affirmed in part, reversed in part, and remanded
Kirk, Judge**

Clay County District Court
File No. 14-CR-13-3787

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Moorhead, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Charles F. Clippert, Special
Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Johnson, Presiding Judge; Connolly, Judge; and Kirk,
Judge.

**U N P U B L I S H E D   O P I N I O N**

**KIRK**, Judge

Appellant Ryan Sabot challenges his convictions of second-degree aggravated
robbery and felony theft, arguing that (1) the evidence was insufficient to prove that he was
the individual who committed the crimes; (2) the district court abused its discretion by

admitting evidence at trial that he had engaged in drug activity and been incarcerated prior to the offenses; and (3) the district court erred by convicting him of and sentencing him for both offenses. We affirm in part, reverse in part, and remand.

## FACTS

On the afternoon of November 6, 2013, K.B. began her shift as a pharmacy technician at a CVS pharmacy. She joined another technician, J.B., and the manager, K.G. When K.B. arrived, K.G. left the pharmacy counter for a bathroom break. After K.G. left, a man came behind the counter and demanded the pain-killer OxyContin. He said that he did not want to hurt anyone but that they better hurry and give him the drug.

OxyContin is kept in a locked cabinet. With K.G. gone, K.B. and J.B. were not able to find the key to the cabinet. The man continued to say that he did not want to hurt them but threatened to hurt them if they did not hurry up and give him what he wanted. The man had his right hand in his jacket pocket and was gesturing with that hand in a way that caused J.B. and K.B. to believe that he was hiding a gun. To diffuse the situation J.B. tried to get him to instead steal hydrocodone—similar to OxyContin but not as strong and not kept in the locked cabinet. He then took several bottles of that drug. As the man left the store, he said, "I'm sorry for having to have done this to you, but I have a problem." He also said that they could call the police, which J.B. did.

K.G. and J.B. had seen the man earlier in the day. He came to the pharmacy counter and said he was there to get a prescription for a woman. When he did not know the woman's birthdate or how to spell her name, K.G. told him that she would not give him the prescription. The man left the counter but remained inside the store.

2

Police used a K-9 unit in an attempt to track the suspect. The K-9 track ended outside an apartment building. Detectives had previously worked on drug cases with an informant who lived in that apartment building. The detectives told the informant about the robbery and showed him a still frame from the CVS's surveillance video. The informant recognized the suspect in the still frame as Ryan. The informant said that he had recently been incarcerated with the suspect at the Clay County Jail. While they were incarcerated, the suspect asked the informant if he had access to OxyContin. The suspect was released in mid-October of 2013, and the informant was released shortly thereafter. After their release, the suspect continued to call the informant looking for opiates such as OxyContin and hydrocodone. The informant said he had last had contact with the suspect two days prior to the robbery. The informant also provided a phone number for the suspect. Police called the Clay County Jail and discovered that the only Ryan in the jail during the period indicated by the informant was Sabot.

On the day of the robbery, police called the phone number the informant provided and spoke with a woman who had previously allowed Sabot to use her phone. The woman told police Sabot's girlfriend's name and also gave them the girlfriend's phone number. Later that evening, the woman saw Sabot at a friend's home and told him that police were looking for him in connection with the robbery. Although she did not share this information with police, detectives were able to use the name and phone number of Sabot's girlfriend to track Sabot to an apartment. On the afternoon of November 7, police apprehended Sabot as he left the apartment building with his girlfriend.

Police showed K.G. a photo of Sabot, and she was not able to identify him as the perpetrator. On separate occasions, police showed J.B. and K.B. a photo-lineup with several photos, including one of Sabot. During the photo-lineup, J.B. was unable to make an identification. After the photo-lineup, J.B. saw a picture of Sabot in the newspaper. Because the man was wearing a hat at the time of the incident, J.B. covered up his forehead. When she did this, she recognized Sabot as the perpetrator. K.B. identified Sabot from the photo-lineup as the perpetrator of the robbery. K.B. also made an in-court identification of Sabot.

After a three-day trial, a jury found Sabot guilty of second-degree aggravated robbery and felony theft. Sabot was sentenced to 45 months in prison on the second-degree aggravated robbery conviction. The district court also sentenced Sabot to a concurrent 27-month prison term on the felony-theft offense. This appeal follows.

## D E C I S I O N

### I.

Sabot argues that the evidence is insufficient to prove beyond a reasonable doubt that he was the individual who robbed the CVS pharmacy. He argues that the identifications provided by the CVS employees and the informant are not reliable and that there is no physical evidence that connects him to the robbery.

When reviewing a verdict, we consider whether the legitimate inferences drawn from the evidence would permit the jury to conclude that the defendant was guilty beyond a reasonable doubt. *State v. Pratt*, 813 N.W.2d 868, 874 (Minn. 2012). Review is limited to a close analysis of the record to determine whether the evidence, when viewed in the

4

light most favorable to the conviction, is sufficient to allow the jury to reach the verdict that it did. *State v. Webb*, 440 N.W.2d 426, 430 (Minn. 1989). We assume "the jury believed the state's witnesses and disbelieved any evidence to the contrary." *State v. Moore*, 438 N.W.2d 101, 108 (Minn. 1989). We will not disturb the verdict if the jury, acting with due regard for the presumption of innocence and the requirement of proof beyond a reasonable doubt, could reasonably conclude that the defendant was guilty of the charged offenses. *Bernhardt v. State*, 684 N.W.2d 465, 476-77 (Minn. 2004).

Sabot claims that "[t]he three eyewitnesses to the robbery were not able to identify [him] as the person involved in the robbery." He is mistaken. Although K.G. was unable to identify Sabot, both J.B. and K.B. identified Sabot as the perpetrator of the robbery. In addition, the informant identified Sabot from a still frame taken from the CVS surveillance video. The informant also testified that Sabot had asked him for opiates, the type of narcotics taken from the pharmacy, as recently as two days prior to the robbery. This testimony not only indicated that Sabot had a motive to rob the pharmacy, but also indicated he had a drug problem. As the robber left the pharmacy, he apologized to J.B. and K.B. and said, "I have a problem." Finally, the jury viewed the surveillance video and had the opportunity to independently identify Sabot.

Sabot claims that "[t]he eyewitnesses all expressed concerns that their identification may have been tainted by media coverage." Although J.B.'s identification was influenced by media coverage, K.B. identified Sabot in a photo-lineup the day after the robbery and testified that she had not seen any media coverage of the case prior to this identification.

5

Sabot next claims that the description of the perpetrator that K.B. gave to police was inconsistent with her trial testimony and that the informant's identification of Sabot is unreliable. After the robbery, K.B. told a detective that she was not sure if the perpetrator had facial hair or just had a dirty face. But she testified at trial that he had facial hair and indicated that she was nervous when she spoke with the detective. K.B. also testified that it was clear to her both during the photo-lineup and at trial that Sabot was the perpetrator.

Sabot attacks the testimony of the informant based on his criminal record and drug use. He also questions how the informant could have identified Sabot from a small still frame of the surveillance video shown to him on a detective's phone. Sabot's challenges to the testimony of K.B. and the informant relate to credibility and the weight to be given to testimony. These are issues for the jury that this court does not review on appeal. *See State v. Pendleton*, 706 N.W.2d 500, 512 (Minn. 2005) ("[I]t is for the jury, not this court, to determine the credibility and weight to be given to the testimony of witnesses."); *State v. Johnson*, 679 N.W.2d 378, 387 (Minn. App. 2004) (concluding that on review for sufficiency of the evidence "inconsistencies and related credibility determinations were for the jury to assess"), *review denied* (Minn. Aug. 17, 2004).

Sabot further argues that the evidence is insufficient to support his convictions because no physical evidence connects him to the robbery. But Sabot knew he was a suspect in the robbery the evening before he was apprehended. He therefore had time to get rid of incriminating evidence. Furthermore, our supreme court has stated that "a conviction may rest on the testimony of a single credible witness." *State v. Miles*, 585 N.W.2d 368, 373 (Minn. 1998). J.B., K.B., and the informant identified Sabot as the

6

perpetrator.  The informant also provided other testimony that implicated Sabot.  And the jury had the opportunity to view the surveillance video and identify Sabot.

We conclude that the evidence is sufficient to support Sabot's convictions.

**II.**

Sabot next argues that "[t]he district court improperly allowed character evidence that [he] was seeking drugs and had been in jail."  Sabot claims that this evidence was irrelevant and unfairly prejudicial.

"Evidentiary rulings rest within the sound discretion of the [district] court and will not be reversed absent a clear abuse of discretion."  *State v. Amos*, 658 N.W.2d 201, 203 (Minn. 2003).  "The district court has a wide range of discretion in determining the relevancy of evidence."  *State v. Schulz*, 691 N.W.2d 474, 477 (Minn. 2005).  We defer to the district "court's evidentiary ruling because the [district] court stands in the best position to evaluate the prejudicial nature of evidence."  *State v. Diggins*, 836 N.W.2d 349, 357 (Minn. 2013) (quotation omitted).  "On appeal, the appellant has the burden of establishing that the [district] court abused its discretion and that appellant was thereby prejudiced."  *Amos*, 658 N.W.2d at 203.

In general, "[a]ll relevant evidence is admissible."  Minn. R. Evid. 402.  Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."  Minn. R. Evid. 401.  However, relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice."  Minn. R. Evid. 403.  "[U]nfair prejudice is not merely damaging evidence, even severely damaging

7

evidence; rather, unfair prejudice is evidence that persuades by illegitimate means, giving one party an unfair advantage." *State v. Swinger*, 800 N.W.2d 833, 839 (Minn. App. 2011) (quotation omitted), *review denied* (Minn. Sept. 28, 2011). "Evidence that is probative, though it may arouse the passions of the jury, will still be admitted unless the tendency of the evidence to persuade by illegitimate means overwhelms its legitimate probative force." *Schulz*, 691 N.W.2d at 478-79. One of those illegitimate means would be "[e]vidence of a person's character or a trait of character" introduced "for the purpose of proving action in conformity therewith on a particular occasion." Minn. R. Evid. 404(a).

The state introduced evidence that Sabot attempted to obtain opiates such as OxyContin and hydrocodone from the informant as recently as two days prior to the offenses. The district court ruled that the evidence was "highly probative or relevant to motive" and admitted it over Sabot's objection. In its final jury instructions, the district court gave a limiting instruction in regard to the evidence.

The drug activity evidence was probative because it demonstrated that just days prior to the robbery Sabot had attempted to obtain the same type of narcotics taken from the pharmacy. It also indicated that Sabot had a drug problem. As the perpetrator left the pharmacy, he apologized to the pharmacy employees and said, "I have a problem." Although the state is not permitted to prove a character trait and action in conformity with that character trait, it is permitted to introduce evidence to prove identity and motive. *See* Minn. R. Evid. 404(b) ("Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as motive . . . [or] identity[.]"); *State v. Ness*, 707

8

N.W.2d 676, 687 (Minn. 2006) (concluding that the state has a right to prove motive because motive explains why an act was committed and can be important to a required state of mind). The evidence of Sabot's prior attempts to obtain opiates showed that he had a motive to commit the robbery and helped the state establish that he was the individual who robbed the pharmacy.

When this court weighs the probative value of evidence against its prejudicial effect, it "must consider how crucial the . . . evidence is to the state's case." *Pierson v. State*, 637 N.W.2d 571, 581 (Minn. 2002) (quotation omitted). Because the surveillance video showed that a robbery took place, identity was the primary issue at Sabot's trial. Although the state had eyewitness testimony and surveillance video, one eyewitness was completely unable to identify the perpetrator and another could only do so after seeing Sabot's picture in the newspaper. In addition, the surveillance video, although certainly very helpful to proving identity, did not provide a completely clear view of the perpetrator. While the evidence was not absolutely necessary to the state's case, it was helpful to corroborate the identifications made by J.B., K.B., and the informant.

As the district court acknowledged, this evidence did carry a risk that the jury would convict Sabot solely on the basis of drug activity, rather than looking closely at the charged conduct. But this risk was neutralized by the district court's limiting instruction that required the jury to consider the evidence only to the extent helpful "in determining whether [Sabot] committed those acts with which he is charged in the complaint" and not to convict Sabot "on the basis of any evidence of drug use." Appellate courts presume that juries follow the district court's instructions. *State v. Budreau*, 641 N.W.2d 919, 926

(Minn. 2002); *see also Diggins*, 836 N.W.2d at 358 (concluding that cautionary instruction "alleviated any possibility that admission of the evidence would unfairly prejudice the jury"). The evidence was probative, and the risk of unfair prejudice was limited. Therefore, we conclude that the district court did not abuse its discretion by admitting evidence of Sabot's attempts to obtain opiates from the informant.

Sabot next argues that the evidence that he had previously spent time in jail with the informant was not relevant, had little probative value, and was highly prejudicial. The district court ruled that the state was entitled to introduce evidence showing how the informant knew Sabot because the probative value of the evidence was not outweighed by the potential for unfair prejudice. The district court drafted and offered to give a limiting instruction as to this evidence, but Sabot was concerned that the instruction would merely highlight the evidence and asked the district court not to give it.

The evidence that Sabot and the informant spent time together in jail was relevant and probative because it allowed police to corroborate the informant's story. Given the informant's drug use and criminal history, he was not the most believable witness. However, the informant's statement that he and Sabot were in jail together during a specific time period allowed police to confirm his relationship with Sabot. This evidence corroborated the informant's identification of Sabot and showed the course of the police investigation. *See State v. Griller*, 583 N.W.2d 736, 743 (Minn. 1998) (agreeing with district court that evidence is admissible to show the course of an investigation).

Sabot argues that this evidence could have been sanitized by limiting the testimony to the fact that Sabot and the informant "lived together and that the police were able to

10

confirm that information." But this type of testimony could have misled the jury and left them wondering exactly how police confirmed the informant's relationship with Sabot. The district court properly permitted the state to present the informant's testimony and show how police confirmed his relationship with Sabot.

Like the evidence of Sabot's drug activity, the informant's testimony that Sabot had previously spent time in jail did have the potential for unfair prejudice. *See State v. Hjerstrom*, 287 N.W.2d 625, 628 (Minn. 1979) (recognizing the unfairly prejudicial nature of prior-incarceration evidence). But this potential was limited by the fact that the jury was not given any information regarding the reasons for Sabot's prior incarceration. *See State v. Halverson,* 381 N.W.2d 40, 44 (Minn. App. 1986) ("The prejudicial value of the evidence was limited by a cautionary instruction and by the fact that no evidence of the nature of the crime for which appellant was in jail was introduced."), *review denied* (Minn. Mar. 21, 1986). Although a cautionary instruction specific to the prior incarceration was not given, the district court offered to give the instruction and only failed to do so because of Sabot's request. Furthermore, by directing the jury to focus only on the charged conduct, the cautionary instruction regarding drug activity likely also limited the unfairly prejudicial effect of the prior incarceration evidence. The probative value of the evidence was not substantially outweighed by its potential for unfair prejudice. We therefore hold that the district court did not abuse its discretion by admitting the evidence of Sabot's prior incarceration.

## III.

Sabot also argues that the district court erred by convicting him of and sentencing him for both second-degree aggravated robbery and felony theft. Minn. Stat. § 609.04, subd. 1 (2012), provides that a person "may be convicted of either the crime charged or an included offense, but not both." An "included offense" is a "lesser degree of the same crime" or a "crime necessarily proved if the crime charged were proved." *Id.* Theft is an "included offense" of aggravated robbery. *State v. McClenton*, 781 N.W.2d 181, 187 (Minn. App. 2010), *review denied* (Minn. June 29, 2010). As the state concedes, Sabot's felony-theft conviction and sentence must be vacated. Accordingly, we remand with instructions to the district court to vacate Sabot's felony-theft conviction and sentence. The unadjudicated felony-theft jury verdict remains valid. *See* Minn. Stat. § 609.02, subd. 5 (2012) (providing that in order to qualify as a "[c]onviction," a "verdict of guilty by a jury" must be "accepted and recorded by the court"); *see also State v. Pflepsen*, 590 N.W.2d 759, 766 (Minn. 1999) (explaining proper procedure when an adjudicated conviction is vacated).

Sabot makes two claims in his pro se supplemental brief. He argues that the district court committed plain error affecting his substantial rights by allowing the jury to view the surveillance video "on their own without the opinion of an expert" and that he was improperly excluded from a settlement conference. We have thoroughly examined these issues and conclude that they are without merit.

**Affirmed in part, reversed in part, and remanded.**

12